# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4615 | **DATE** | 6/6/2000 |
| **CASE TITLE** | Louis V. Levit vs. R. T. Milford Company, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The decision of the Bankruptcy Court is reversed, and judgment is entered in favor of Appellant for the amount of the distribution made to the limited partners, plus interest.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 11 | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | JUN 07 2000 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | 6/6/2000 | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| ETV | courtroom deputy's initials | | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE:

THUNDERDOME HOUSTON LIMITED )
PARTNERSHIP, a/k/a CLUBLAND )
HOUSTON, )
            )
       Debtor. )
            )
_____ )
            )
LOUIS W. LEVIT, as Trustee in )      No. 98 C 4615
Bankruptcy of Thunderdome Houston )
Limited Partnership, )
            )      Judge Rebecca R. Pallmeyer
      Plaintiff-Appellant, )
            )
      v. )
            )
R.T. MILORD COMPANY, *et al.* )
            )
     Defendants-Appellees. )


DOCKETED
JUN 0 7 2000

## MEMORANDUM OPINION AND ORDER

Louis W. Levit ("Levit" or "Appellant"), a trustee in bankruptcy, seeks to compel the limited partners ("Appellees") of Thunderdome Houston Limited Partnership ("Thunderdome" or "Partnership") to return distributions of Partnership income made to Appellees. Levit alleges that the distributions constituted fraudulent conveyances under the Illinois Uniform Fraudulent Transfer Act ("UFTA") and its precursor, the Statute of Elizabeth ("SOE"). He asserts, further, that the distributions violate the terms of the Partnership Agreement and the Illinois Revised Uniform Limited Partnership Act ("RULPA") and therefore are recoverable under RULPA. The bankruptcy court rejected

Levit's claims, and he now appeals to this court. For the reasons set forth below, the decision of the bankruptcy court is reversed, and judgment is entered in favor of Appellant for the amount of the distributions, plus interest.

## BACKGROUND

### A.     Factual Background

On September 6, 1998, a private offering (the "Offering Memorandum") was submitted to prospective investors in an Illinois limited partnership, Thunderdome, detailing a multidimensional nightclub project (the "Project") to be known as ClubLand at the Tower Theater in Houston. (Def. Ex. 1.) After renting and renovating space in the theater building, the Project expected to generate revenue from three separate operations:   (1) sales to customers and event organizers at private parties; (2) sales of food and drink at live events; and (3) the operation of an after-hours night club.  (Tr. 375-76.)  Thunderdome Houston Enterprises, Inc. ("General Partner"), an Illinois corporation, was the organizer, promoter and general partner, and was owned, operated and controlled by its president, Steven Jarvis ("Jarvis"). (Def. Ex. 1, at 24.)  The Offering Memorandum stated that "[t]his investment is speculative and involves a high degree of risk . . .[a]n investor must be able to bear the economic risks of a total loss of their investment."  (Def. Ex. 1, at iv.)  The Offering Memorandum highlighted various risk factors, including, "A Partnership In Formation With No Operating History,"   "Absence of Contingency Funds," "Uncertainty of Public Acceptance," "Management/Lease Agreement," and "Single Investment." (Def. Ex. 1, at 9-12.)  In response to the Offering Memorandum, ten limited partners purchased a total of

twenty-four units in Thunderdome at $12,500 each, totaling $300,000 in capital contributions. (Pl. Exs. 7-15.) The proceeds were deposited into the Partnership checking account. (Def. Ex. 4.) All pre-operating expenses, except for management fees, were paid from the capital contributed by the limited partners before December 31, 1998. (Tr. at 472-73; Def. Ex. 2, Income Statement for Period Ending Dec. 31, 1998.)

Before it commenced business, Thunderdome created a Texas corporation, 1201 Westheimer, Inc. ("1201"), in order to comply with Texas law requiring liquor licensees to be Texas residents. (Def. Ex. 1, at 19.) Mr. Jarvis testified that even though they maintained separate bank accounts and accounting records, 1201 and Thunderdome constituted "one business operation." (Tr. 330.) 1201 received the deposits from operations and paid expenses during operations, and Thunderdome made distributions to the limited partners from the Partnership checking account.[1]

Shortly after its organization, Thunderdome entered into two lease agreements. The first lease covered the premises to be occupied in the theater building and required Thunderdome to pay a minimum monthly rental of $10,833.33, plus the difference between the minimum rent and seven percent of gross revenue for the month, as well as a varying percentage of parking revenue. (Pl. Ex. 22.) The other lease was with R.T. Milord Co. ("Milord"), a limited partner, and covered the sound and video equipment. (Pl. Ex. 21.) The

---

[1]     "Management fees" which appear on the 1201 income statements were actually transfers to the Partnership checking account and therefore did not constitute actual expenses. (Tr. 473-74.)

Milord lease required Thunderdome to pay $12,683.88 per month. (*Id.*) Each lease was for a period of three years. (Tr. at 347; Pl. Ex. 21.)

The Project opened for business on December 9, 1988, and initially enjoyed greater success than Jarvis expected based on his prior experience with a Chicago nightclub. (Pl. Ex. 37, letter from Jarvis to limited partners dated 1/9/89.) In the seven months following the opening of the Project, Thunderdome returned the entire invested $300,000 capital to the limited partners, plus an additional $9,332.80. (Pl. Ex. 16.) Specifically, the distributions were made as follows: $99,999.99 in January 1989; $74,999.93 in February 1989; $74,999.93 in March 1989; $24,965 in April; 22,952.22 in June 1989; and $11,415.73 in July 1989. (*Id.*) Jarvis characterized the distributions made from January through April of 1989, totaling substantially the entire original investment, as based on an "accelerated 'pay-back' percentage." (Pl. Ex. 37, letter from Jarvis to limited partners dated 7/9/89.)

Both the Partnership Agreement and the Offering Memorandum contained provisions outlining the circumstances under which distributions were to be made to the limited partners. The Agreement stated that distributions were to be made from "Cash Flow," and that such distributions shall be made at least annually. (Def. Ex. 1, Ex. D, at § 6.02.) Cash Flow is defined in the Agreement as "the cash generated by the Net Profits of the Partnership available for distribution after establishment of the Operating Fund and provision for all Partnership liabilities, as determined in the sole discretion of the General Partner." (*Id.*, at § 1.07.) The definition of Cash Flow is dependent on these following definitions:

4

> "**Net Profits**" means the excess of gross receipts of the Partnership over the sum of payments for Operating Expenses, rental payments under the Management/Lease Agreement, and payment of a percentage of the Partnership's gross revenues to the General Partner as set forth in the Project Management Agreement.
>
> "**Operating Expenses**" means those expenses incurred by the Partnership in the operation of the Project, including, but not limited to, salaries and labor costs associated with the employment of bartenders, dancers, head programmers, DJS, lighting, stage managers and bar operations managers, beverage costs, operating supplies, general and administrative costs, utilities, video equipment lease costs, dram shop insurance and advertising.
>
> "**Operating Fund**" means the reserve fund created by the General Partner out of Cash Flow in the amount of $25,000 or such other amount as determined in the sole discretion of the General Partner to cover day-to-day operational expenses.

(*Id.*, at 1.19, 1.20, 1.21.) The Offering Memorandum also stated that if Thunderdome, after a distribution to its partners, does not have sufficient assets to meet its liabilities, "the General and Limited Partners will be liable to be called upon to return pro rata any cash distributed to them up to the full amount thereof." (Def. Ex. 1, at 28.)

Prior to opening, the Partnership incurred $83,000 in expenses. (Def. Ex. 2.) The parties dispute whether those expenses should be included as "Operating Expenses," and therefore, dispute whether the Partnership profited or lost money in December 1988. The Appellant and his expert witness, Alan D. Lasko, C.P.A. ("Lasko") assert that these expenses should be included as Operating Expenses in determining the Cash Flow for the month of December 1988 because these expenses were not included as a capital asset subject to depreciation and amortization under Generally Accepted Accounting Principles ("GAAP"). Based on Lasko's calculations, under which the $83,000 payments constitute Operating Expenses, the Partnership lost money in December 1988. (Appellant's Br., at 27-30.)

Appellees and their expert witness, Dennis F. Decker, C.P.A. ("Decker") assert the contrary, concluding that the $83,000 was part of the original application of capital to start-up costs. Under this analysis, the Partnership realized a profit in December 1988. (Appellee's Br., at 13-17.) The Bankruptcy Court found that the initial $83,000 general and administrative expense was not to be considered in determining Cash Flow for the month of December, 1988, and concluded that the Cash Flow for that month equaled $73,742.26. *See In re Thunderdome Houston Ltd. Partnership*, Nos. 94 B 18326, 95 A 82, 1998 WL 355509, at *3 (Bankr. N.D. Ill. June 19, 1998). The Bankruptcy Court further calculated the Net Profits and Losses, after distributions, for the period from January 1989 to July 1989 as follows: $79,664.76 Net Profit in January 1989; $58,545.83 Net Profit in February 1989, $61,260.70 Net Profit in March 1989; $62,246.40 Net Profit in April 1989; $21,385.40 Net Loss in May 1989, $10,175.33 Net Profit in June 1989, and $28,854.33 Net Profit in July 1989. *Id.*

On April 7, 1989, the Texas Alcoholic Beverage Commission required Thunderdome to post a $25,000 Certificate of Deposit to secure payment of future liquor taxes. (Pl. Ex. 37, letter from Jarvis to limited partners dated 4/10/89.) As early as April 1989, Jarvis noted a "slump" in ticket sales of the theater production at Tower Theater, reducing the amount of revenue generated from theater concessions. (*Id.*) In May 1989, a month in which the Partnership lost money, Jarvis notified the limited partners of a "slight seasonal lull" in the nightclub business. (*Id.*, letter dated 5/9/89.) Thunderdome lost money from operations during the months of August through November of 1989. In September 1989, Jarvis explained to the limited partners that the club's business had slowed considerably because of

the fickle nature of the young Houston nightclub market, new competitors and slow theater concession sales. (*Id.*, letter dated 9/9/89.) Finally, on November 18, 1989, Jarvis sent a letter to the limited partners explaining that the Partnership was shutting down the club and indicating that the Partnership needed an immediate $50,000 to cover insurance premiums and liquor tax bonds and another $50,000 to cover past due bills from bar operations. (Pl. Ex. 39.) In a "What Went Wrong" letter to the limited partners, Jarvis ascribed the ultimate closing of the Project, among other things, to "Not enough reserve," stating that "[t]he large weekly bills associated with running a theatr [sic] quickly gobbled up what reserve cash we had on hand, making it impossible to keep the doors open for long." (Pl. Ex. 41.)

## B.    Procedural History

On April 11, 1991, Milord, a limited partner of Thunderdome as well as a lessor-creditor, brought an action against Thunderdome for the balance due on its defaulted lease for video, lighting and other equipment. During the resulting litigation, Thunderdome filed for bankruptcy under chapter seven of the Bankruptcy Code. Upon his appointment in the Bankruptcy Case, Appellant removed the Milord recovery action to the bankruptcy court and substituted himself as plaintiff. That action was tried before Judge Thomas James, who retired from the bench before rendering a decision in the case. Pursuant to a stipulation between the parties, newly assigned Judge Erwin I. Katz agreed to decide the case based on the record created before Judge James. On June 19, 1998, Judge Katz issued a written opinion ("the Opinion") granting judgment in favor of the Defendants and against the Plaintiff-Trustee on all counts. Levit filed a timely notice of appeal.

## C.    Bankruptcy Court's Opinion

After reviewing the trial transcripts and the documentary evidence, Judge Katz issued

an opinion with thirty-eight findings of fact and twenty-three conclusions of law. *See In re*

*Thunderdome*, 1998 WL 355509, at *1. The findings of fact primarily in dispute in this appeal

are the following:

> 23.    The Trustee has not met his burden of proof that any of the distributions were made in excess of Cash Flow as defined by the Partnership Agreement. The cumulative Cash Flow exceeded the aggregate amount of distributions at the end of each month in which a distribution was made to the Limited Partners.
>
> *   *   *
>
> 26.    Given the language of the Partnership Agreement, the manner in which the fund was maintained, as well as the balances that were maintained in the [1201] operating account to cover liabilities, were not unreasonable. The General Partner did not abuse its discretion in setting aside amounts for the Operating Fund and Partnership liabilities.
>
> 27.    The Trustee has not shown that the Partnership, at the time of any distribution, was unable to pay its debts as they became due. No evidence exists to counter Jarvis's testimony that the Partnership paid its bills at the time of each distribution and continued to pay its bills thereafter. The Trustee has not established that the bank balances for the relevant months, combined with the incoming revenues from operations, were insufficient for the Partnership to remain current on its debts given the foreseeable expenses.
>
> 28.    The Trustee did not prove that the Partnership's current liabilities exceeded its assets after any of the distributions. The Trustee's expert witness admits that his analysis contains an erroneous entry for liabilities from management fees "due to Thunderdome Houston Enterprises," resulting in an overstatement of liabilities. If this erroneous entry is not included in the calculation of liabilities, then Lakso's own analysis demonstrates that the value of the Partnership's assets exceeded its liabilities after the distributions.
>
> *   *   *
>
> 30.    The Partnership Agreement did not include a provision requiring the Limited Partners to return their distributions in the event of a business downturn. Although the Offering Memorandum cautioned the

8

> Limited Partners that they may "be liable to be called upon to return pro rata any cash distributed to them up to the full amount thereof," this statement was apparently intended merely to describe the applicable Illinois law to potential investors. See 805 Ill. Comp. Stat. 210/608(b).

*Id.* at *3-4. Without significant elaboration, Judge Katz repeated these findings of fact in his conclusions of law. Specifically, on Levit's breach of partnership agreement claim, the Bankruptcy Court, referring to its findings of fact, concluded, "[f]or the reasons stated earlier, the Trustee has been unable to demonstrate that any of the distributions violated the Partnership Agreement.... *Again*, the Trustee has not shown that the distributions rendered the partnership insolvent, and has therefore not demonstrated that any of the distributions violated the terms of the Partnership Act." *Id.* at *6 (emphasis added). With respect to Levit's fraudulent conveyance claim, without determining whether "reasonably equivalent value" was given in exchange for the investments, Judge Katz concluded that:

> 61. The Trustee has failed to prove that the debtor was insolvent at the time the distributions were made to Limited Partners. *As noted earlier*, the Trustee failed to prove that the debtor was left with unreasonably small assets as a result of the distributions. Moreover, the Trustee has not shown that the Partnership, at the time of the distribution, was unable to pay its debts as they became due. Therefore, the Trustee has been unable to demonstrate that any of the distributions were fraudulent transfers in law under the Fraudulent Transfer Act."

*Id.* at *8 (emphasis added). Based on these findings and conclusions, Judge Katz entered judgment in favor of the Defendant/Appellee on both claims. *Id.*

## DISCUSSION

### A.     Standard of Review

Appellant asserts that Judge Katz's findings of fact were actually conclusions of law subject to *de novo* review.  Further, Appellant argues that Judge Katz improperly applied the test for determining whether a transfer is fraudulent in law.  Appellees argue that Judge Katz's findings of fact are precisely that, and therefore subject to the deferential "clearly erroneous standard."

This court reviews the bankruptcy court's legal conclusions de novo and its factual findings for clear error.  *See In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607 (7th Cir. 1998); *see also* FED.R.BANKR.P. 8013.  Clear error means that "although there is evidence to support the findings, the court is left with the definite and firm conviction that a mistake has been committed."  *See Matter of Robert Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995).  Although it is true that Judge Katz did not have the opportunity to observe the demeanor of the witnesses, he did base his opinion on the testimony of the witnesses and the documentary exhibits in evidence.  This court concludes, contrary to Appellant's contention, that Judge Katz's findings of fact are subject to the clearly erroneous standard of review.  *See In re Gionis*, 170 B.R. 675, 680 (B.A.P. 9th Cir. 1994), *aff'd*, 92 F.3d 1192 (9th Cir. 1996) (applying clearly erroneous standard to bankruptcy court's factual findings based on documentary evidence in the form of records of state court proceedings).  Mixed questions of law and fact, that are driven by factual inquiries and where there is no compelling need for uniformity and clarity in the application of legal principles by the courts, are also reviewed under the clearly

erroneous standard. *See In re Rovell*, 194 F.3d 867, 871-72 (7th Cir. 1999) (citing *Ornelas v. United States*, 517 U.S. 690, 696-97 (1996)).

With respect to the fraudulent conveyance claim, this court agrees with Appellant that paragraph 27, and the first sentence of paragraph 28 of Judge Katz's opinion, although labeled "findings of fact" in reality constitute legal conclusions in that Judge Katz applies legal standards to the facts. This determination is supported by the "legal conclusion" found in Paragraph 61 of the opinion which states, "*[a]s noted earlier*, the Trustee failed to prove [the elements of fraudulent conveyance]." *See Thunderdome*, 1998 WL 355509, at *8 (emphasis added). As mixed questions driven by factual inquiries, this court will apply a clearly erroneous standard to these findings.

## B. Fraudulent Conveyance

Appellant asserts that the accelerated distributions to the limited partners were constructively fraudulent, and therefore voidable pursuant to UFTA and SOE. Specifically, Appellant argues that the distributions were made without the debtor receiving reasonably equivalent value, and that the distributions left the debtor with "unreasonably small" assets or with assets which the debtor reasonably should have believed would lead to an inability to pay debts as they became due. Appellees assert that the distributions were not constructively fraudulent. They argue that Thunderdome received reasonably equivalent value for the distributions, and that because account balances showed a net profit for the months from January 1989 through July 1989, Thunderdome's assets were not unreasonably small.

11

Under the Bankruptcy Code, a trustee may avoid the transfer of a debtor's interest that is avoidable under applicable law. *See* 11 U.S.C. § 544(b). Under Section 544(b), the applicable law for determining the rights of an unsecured creditor is state law; in this case, the Illinois fraudulent conveyance statutes. UFTA took effect January 1, 1990, but is applicable retroactively to the distributions involved here which took place in 1989. *See In re Spatz*, 209 B.R. 907, 926 n.39 (Bankr. N.D. Ill. 1997), *rev'd on other grounds*, 222 B.R. 157 (N.D. Ill. 1998); *Cannon v. Whitman Corp.*, 212 Ill. App. 3d 79, 84, 569 N.E.2d 1114, 1118 (5th Dist. 1991).[2] The UFTA makes unlawful not only those conveyances made with actual fraudulent intent, but also any conveyances that are constructively fraudulent. *See Scholes v. Lehmann*, 56 F.3d 750, 756-57 (7th Cir. 1995).

Appellant asserts that the distributions to the limited partners were constructively fraudulent pursuant to the provision of UFTA which construes a transfer as constructively fraudulent if the transfer was made:

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (A) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2). Because the provisions of the UFTA parallel Section 548 of the

---

[2]  Even if the UFTA did not apply retroactively, the preceding SOE, Ill. Rev. Stat., ch. 59, § 4 (1987), also made fraudulent conveyances unlawful. The use of either statute would produce the same result. *See U.S. v. Kitsos*, 770 F. Supp. 1230, 1235 n.13 (N.D. Ill. 1991), *aff'd in part, dismissed in part*, 968 F.2d 1219 (7th Cir. 1992).

Bankruptcy Code which proscribes fraudulent conveyances, findings made under the Bankruptcy Code are applicable to actions under the UFTA. *See In re Spatz*, 222 B.R. 157, 163 (Bankr. N.D. Ill. 1998) (citing *In re Randy*, 189 B.R. 425, 433 (Bankr. N.D. Ill. 1995)).

### 1. Reasonably Equivalent Value

Section 160/5(a)(2) first requires the court to determine whether Thunderdome received reasonably equivalent value for the distributions made to the limited partners. Determination of reasonably equivalent value is a two-step process that initially asks whether the debtor received value. *See Anand v. National Republic Bank of Chicago*, 239 B.R. 511 (N.D. Ill. 1999). The UFTA does not define the term "value;" the Bankruptcy Code defines value as "property, or satisfaction or securing of a present or antecedent debt[.]" *See* 11 U.S.C. § 548(d)(2)(a).

Neither side disputes that Thunderdome did not receive property in exchange for the distributions. The only question is whether Thunderdome paid the distributions in satisfaction of a debt owed to the limited partners. The UFTA defines debt as liability on a claim. *See* 740 ILCS 160/2(e). Claim is further defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *See* 740 ILCS 160/2(c).

Appellees argue that Thunderdome received the value of satisfying the debt to the limited partners. They assert that the limited partners had a contractual right to receive payment as evidenced by Section 6.02 of the Partnership Agreement which required Thunderdome to pay Cash Flow to the limited partners to the extent of their capital

13

contributions, "not less frequently than annually." (Def. Ex. 1, Ex. D, at § 6.02.)

Furthermore, relying on *Scholes v. Ames*, 850 F. Supp. 707 (N.D. Ill 1994), *aff'd sub nom.*,

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), Appellees assert that the Seventh Circuit has

established a rule that a distribution from a partnership to a limited partner, to the extent of

the limited partner's investment, is a transfer for reasonably equivalent value. Appellant

argues that *Scholes* is inapplicable here because the limited partners in that case were defrauded

by a Ponzi scheme, and therefore had an inherent right to restitution for any investment they

had made. Further, Appellant argues that the Partnership Agreement does not confer a

contractual right to payment upon the limited partners. Relying on *In re Agricultural

Research & Tech. Group, Inc.*, 916 F.2d 528 (9th Cir. 1990), Appellant contends that the limited

partners' capital contributions amounted to investments in the equity of the enterprise, and

therefore do not fit within the meaning of debt under the UFTA.

The court agrees with Appellant. First, the provision in the Partnership Agreement

requiring that distributions be made from Cash Flow no less frequently than annually cannot

be read as a contractual obligation to pay back the limited partners' entire investment within

the first four months of operation. Contrary to what Appellees contend, payment was not

unconditional; rather the making of distributions was contingent upon the existence of Cash

Flow. Further, there was no existing liability or obligation on the part of Thunderdome to

make all or any portion of the distributions at any time prior to the completion of one full

year's operations. Indeed, if Jarvis had exercised the discretion afforded him by this provision

and waited until the end of the year to make distributions, this case would not be before the

court today because the Partnership had no Cash Flow at that time.

Second, the court is not persuaded that *Scholes* has established a rule in this Circuit that distributions like those made here are always in exchange for value. In *Scholes*, a series of limited partnerships sold limited partner interests to the investing public. *See Scholes*, 850 F. Supp. at 709. The capital funds invested by the limited partners were purportedly to be used in commodities. *Id.* Instead, the entire arrangement was a Ponzi scheme whereby subsequent capital contributions were used to make distributions to prior limited partners. *Id.* at 710. The primary issue before the District Court in *Scholes* was whether the payments received by the limited partners in excess of their capital contributions were fraudulent conveyances. *Id.* at 715. In deciding that these profits were fraudulently conveyed because no value was given in return, Judge Alesia, in dicta, noted that the distributions made up to the amount of the investors' principal investments were not fraudulently made. *Id.* In so deciding, Judge Alesia wrote, "[t]hrough their investments, the defendants entered into a contractual relationship with the limited partnerships. In doing so they gave cash. . . and took a risk that the investments would be lost. . . .As such, defendants gave value for the principal investment returned to them[.]" *Id.*

*Scholes* is distinguishable from this case. First, in affirming the District Court, the Seventh Circuit addressed only the issue of the profits returned to the limited partners, not their principal investment. Therefore, the dicta in the *Scholes* District Court's opinion-- stating that limited partners give value for the principal investment returned to them because they took a risk that they would lose their investment--does not create a general rule that

15

limited partners always are deemed to have given value by merely contributing capital.

*Scholes* is also distinguishable on the facts. In contrast to the present case, in *Scholes*, the limited partnership was never a legitimate business operation, and had no true creditors with superior claims. Furthermore, in most cases dealing with the issue of whether a payment in the amount of the contributed capital from a Ponzi operation should be given the status of reasonably equivalent value, the courts have reasoned that because a Ponzi investor immediately obtains a claim for restitution against the debtor upon making the investment by virtue of the debtor's fraud, the claim constitutes a debt owed to the investor. *See Mark A. McDermott, Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 AM. BANKR. L.J. 157, 165-66 (1998) (citing cases). Indeed, in another case arising out of the same Ponzi scheme, Judge Alesia so held. *See Scholes v. African Enterprise, Inc.*, 854 F. Supp. 1315, 1326 (N.D. Ill. 1994) (holding that when debtor's expenditure of funds obtained from investors coincided with intent to dissipate funds in a manner inconsistent with fiduciary responsibilities as a partner, indebtedness arose in favor of those investors against debtor for purposes of determining fair consideration).

The distinction is illustrated in a Ninth Circuit decision, *In re Agricultural Research & Tech. Group, Inc.*, 916 F.2d 528 (9th Cir. 1990). In that case, the Ninth Circuit considered the issue of value in the context of investments in a legitimate business venture that subsequently degenerated into a Ponzi scheme. The claims in *Agricultural Research* arose under Hawaii's Fraudulent Transfer Act, which in material respects is substantially identical to Illinois' UFTA. In *Agricultural Research*, the debtor was a corporation engaged in the business of

16

producing, cultivating and marketing tropical foliage plants. *See Agricultural Research*, 916

F.2d at 532. The debtor accepted and cultivated seeds from investors who made cash advances

to the corporation to cover its cultivation costs. *Id.* In turn, the debtor agreed to re-purchase

the germinated seeds (the "seedlings") from the investors for a predetermined amount which

guaranteed the investors a substantial return on their investments. *Id.* One of the investors

was Palm Seedlings-A ("PSA"), a limited partnership. *Id.* The revenue generated from the sale

of seedlings grown from the PSA seeds was not enough to support the payment PSA had

been promised, but PSA's general partner nevertheless insisted that distribution be made.

The debtor financed the payment to PSA from new investments, and PSA in turn made

subsequent distributions to its limited partners. *Id.* at 533. After a former president of the

debtor pleaded guilty to participating in a Ponzi scheme, the trustee in bankruptcy sought

to recover certain distributions including the subsequent transfers made by the debtor's

investor, PSA, to its limited partners. In determining whether these limited partners gave

value for these distributions, the Ninth Circuit looked to the definition of value under

Hawaii's fraudulent transfer statute. *See id.* at 540. Noting that value is defined as property

or the securing or satisfaction of a debt, the court further observed that under the Bankruptcy

Code, limited partnership interests are classified as "equity security." *See id.* (citing 11 U.S.C.

§ 101(16)(B)). The court drew the following conclusion:

> The partnership distributions here were not for value because [PSA] made the
> distributions on account of the partnership interests and not on account of
> debt or property transferred to the partnership in exchange for the
> distribution.

> Furthermore, comment 2 to the Uniform Fraudulent Transfer Act states that value is to be determined in light of the act's purpose, in order to protect creditors. Any consideration not involving utility for the creditors does not comport with the statutory definition. (citation omitted). Thus, distributions to limited partners is not value because any other definition would not further protection of creditors.

*See id.* This court finds the Ninth Circuit's analysis persuasive. Although the facts in *Agricultural Research* are distinguishable from those presented here, the rationale of the Ninth Circuit is based on the definition of value and the purpose of the Bankruptcy Code to protect creditors. Here, the distributions were likewise made "on account of the partnership interests" and not in satisfaction of a pre-existing debt or in exchange for property. Moreover, to find the existence of value in exchange for the distribution would be to hinder Thunderdome's creditors in contravention of the purpose of the Bankruptcy Code. This court concludes that the limited partners did not give reasonably equivalent value for the distributions they received.

### 2. Unreasonably Small Assets or Inability to Pay Debts

Subsections (A) and (B) of Section 160/5(a)(2) of UFTA render avoidable any transfer which either leaves the debtor with assets that are unreasonably small in relation to its liabilities, or which the debtor reasonably should have believed would lead to an inability to pay debts as they became due. *See* 740 ILCS 160/5(a)(2)(A), (B). Appellant argues that Judge Katz misapplied the standard set forth in these subsections by referring to the Partnership Agreement in determining that the account balances were not unreasonable, and by focusing only on the assets and liabilities of the Partnership at the time the distributions were made.

Further, Appellant contends that under the objective "reasonableness" standard in subsection (B), a reasonably prudent business person, knowing all the factors known to Thunderdome, including the outstanding rental agreements, would reasonably have concluded that to make more than a 100% return to investors would be an unsound business move. Appellees argue that undisputed evidence shows that, after distributions were made, the Partnership still had significant cash on hand each month through July of 1989. Further, Appellees argue that the outstanding lease agreements do not constitute debt and therefore should not figure into the analysis under subsection (A) and (B) as a liability.

Appellant cites a number of Illinois cases for the proposition that Section 160/5(a)(2) requires an inquiry beyond the immediate short-term effect of the challenged transfer. As Appellees point out, each of these cases is factually distinguishable from this one. *Falcon v. Thomas*, 258 Ill. App. 3d 900, 629 N.E.2d 789 (4th Dist. 1994) involved a judgment debtor who transferred real property to his son while an action was pending against him by judgment creditors. Even though the transfer did not render the debtor immediately insolvent, the court found that based on a series of subsequent transactions by the debtor resulting in the disposal of his assets made in the face of an outstanding claim, the real estate conveyance was constructively fraudulent. *See Falcon*, 258 Ill. App. 3d at 912, 629 N.E.2d at 797. *Birney v. Soloman*, 348 Ill. 410, 181 N.E. 318 (Ill. 1932) involved a retail store owner who disposed of certain assets while he was in failing financial circumstances and had large outstanding debts. The court held that although the debtor was not rendered immediately insolvent, under the circumstances the transfer of real estate to his wife was constructively

fraudulent in that it tended to hinder and delay his creditors. *See Birney*, 348 Ill. at 415, 181 N.E. at 320. Such is not the case here; the Partnership, as evidenced by the 1201 accounts, showed a profit during the months it made distributions to the limited partners. There is no evidence that Thunderdome was systematically disposing of its assets in order to prevent creditors from reaching them.

Nevertheless, this court agrees with Appellant that subsections (A) and (B) are forward-looking, requiring consideration of liabilities the debtor "would incur" or contemplated transactions for which the remaining assets were "unreasonably small." Although the cases cited by Appellant are factually distinguishable, their legal propositions are applicable here. Both *Falcon* and *Birney* hold that proof of actual insolvency at the time of the transfer is not the appropriate inquiry for determining whether the transfer was constructively fraudulent. *See Falcon*, 258 Ill. App. 3d at 911-12, 629 N.E.2d at 796-97; *Birney*, 348 Ill. at 414-15, 181 N.E. at 320. Rather, the test is whether the transfer directly tended to or did impair the rights of creditors. *Id.* Indeed, the courts in both cases looked to events subsequent to the challenged transfer to determine whether the assets retained by the debtor were sufficient to discharge his liabilities. *Id.* Moreover, subparagraph (B) of section 160/5(a)(2) sets forth an objective standard requiring only that a reasonably prudent business person should have known that he would incur debts beyond his ability to pay. Therefore, with respect to the application of subsections (A) and (B) to the facts, this court concludes that the Bankruptcy Court's findings in paragraph 27 are clearly erroneous.

The Bankruptcy Court accurately set forth the applicable legal standard in paragraph 58 of its opinion, and referred specifically to "foreseeable expenses" in its application of this standard to the facts in paragraph 27. Nevertheless, in applying the facts to subsections (A) and (B), the Bankruptcy Court observed only that Appellant did not show that the Partnership was unable to pay its debts "at the time of distribution." *Id.* at *4. This court accepts Judge Katz's finding that Thunderdome realized a Net Profit in each month that distributions were made This court does not agree, however, that the appropriate analysis merely requires a determination of whether the distributions exceeded Cash Flow in the month the distribution was made. *See In re Thunderdome*, 1998 WL 355509, at *3.

Taking into consideration all relevant factors, this court concludes that a reasonably prudent person should have known that making a 100% return on capital investments within the first four months of an admittedly "fickle" and risky business enterprise would eventually render the Partnership unable to pay debts as they became due or leave the Partnership with unreasonably small assets in relation to contemplated transactions. Thunderdome's revenue was wholly dependent upon walk-in clientele and the continuing success of the adjacent theater production, which as early as April 1989 had "hit a slump." Its credit position was unstable enough to require that it enter into a sublease with stepped-up payments in order to finance the sound, light and video system, and to require it to post a $25,000 certificate of deposit to secure payment of liquor taxes. Although Thunderdome showed a monthly Net Profit ranging from $10,000 to $80,000 during seven of its first eight months in operation, the 1201 account balances also show that monthly expenses averaged near $200,000. (Def. Ex. 2.)

21

Indeed, during the months of May, June, and July, the average weekly revenue realized was not much more than the weekly operating expenses of the Project. Without more capital reserve, a decrease in income would inevitably have resulted, and did result, in the Partnership's insolvency. Four months after the final distribution to the limited partners, Thunderdome was insolvent, and the creditors were impaired because the entire equity reserve had been returned to the investors. Jarvis himself pointed to the lack of reserve capital in his "What Went Wrong" letter to the limited partners.

Significantly, the Bankruptcy Court did not consider the outstanding balances on the two leases in its analysis. Although under accounting practices, the only portion of a lease obligation carried as a liability is the current payment, the lease obligations here fall squarely within the definition of "debt" in UFTA – the lessors had a "fixed" right to payment totaling approximately $600,000. *See* 740 ILCS 160/2(c), (e). Indeed, for Thunderdome to continue to operate, it was obligated to make regular and timely payments over the entire three-year period of each lease. These obligations are clearly "debts" contemplated by subsection (B).

The court concludes that a reasonably prudent person, knowing all the circumstances known to Jarvis at the time, and having reason to understand the risk inherent in the operation of a night club, would have retained the capital investments until the end of a year of operations, as allowed in the Partnership Agreement. In light of all foreseeable expenses and liabilities, Jarvis should have known that by making the distributions on an accelerated basis, he rendered the business unable to pay contemplated debts as they became due. Because the distributions tended to, and directly did impair the rights of the creditors, they were

constructively fraudulent.

Having determined that the distributions are avoidable pursuant to UFTA, the court need not address whether the distributions violated the Partnership Agreement.

## C. Prejudgment Interest

Because the Bankruptcy Code does not specifically provide for the award of prejudgment interest, whether to grant prejudgment interest in a fraudulent conveyance action is within the discretion of the court. *See In re FBN Food Svcs., Inc.* 175 B.R. 671, 690 (Bankr. N.D. Ill. 1994) (citations omitted). The purpose of allowing prejudgment interest is compensatory, not punitive; such interest is granted to make the prevailing party whole. *See In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997). Not only must the award of prejudgment interest be compensatory, it is also within the court's discretion to determine if such award is equitable. *See id.* ("Discretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so."); *In re FBN*, 175 B.R. at 690 ("The purpose of allowing prejudgment interest is to enable a prevailing plaintiff to be made whole in the absence of countervailing equities[.]"). "Discretion is not, however, authorization to decide who deserves the money more." *In re Milwaukee Cheese*, 112 F.3d at 849. In other words, prejudgment interest is "simply an ingredient of full compensation," and should not be considered a windfall. *See Bergner & Co. v. Bank One, Milwaukee, N.A.*, 140 F.3d 1111, 1123 (7th Cir. 1998).

Here, Appellees argue that based on their credible defense during the bankruptcy proceedings, an award of prejudgment interest would be inequitable. Appellees cite one case

for support of their argument, *In re R.M.L., Inc.*, 195 B.R. 602 (Bankr. M.D. Pa. 1996). *R.M.L.* involved a preference action wherein a creditors committee sought to avoid certain transfers. The court found in favor of the committee, but declined to award it prejudgment interest. *See id.* at 624. Although the court acknowledged that it usually denied prejudgment interest where a credible defense had been raised, it instead engaged in a process of balancing the relative strength of certain claims and defenses made by each party. *See id.* at 623-24. Ultimately, the court determined that the committee was not entitled to an award of interest because, although the transferee's defense was weak, the committee's fraudulent transaction claim "was little stronger." *See id.* at 624.

This court is not persuaded by *R.M.L.*'s analysis, as it is inconsistent with the Seventh Circuit's caution that discretion is not license for the court to "decide who deserves the money more." *In re Milwaukee Cheese*, 112 F.3d at 849. Further, an award of interest here would not serve to punish Appellees, but rather to return Appellant to its original economic position. Had the transfers been returned to the Partnership and distributed to its creditors, they would have been able to earn interest on the money during the last several years. The court concludes that Appellant is entitled to prejudgment interest from the date the adversary proceeding is commenced. *See In re FBN Food Servs., Inc.*, 175 B.R. 671, 691 (Bankr. N.D. Ill. 1994), *aff'd in part, remanded in part on other grounds*, 82 F.3d 1387 (7th Cir. 1996). Appellant urges this court to adopt April 11, 1991 as the date from which to calculate interest, arguing that because one of the Partnership's lessor-creditors filed suit in state court on that date to recover for breach of the lease agreement, adversarial proceedings in this case were

commenced. The court disagrees and concludes that Appellant instituted a separate adversarial proceeding when it removed that case to the bankruptcy court on February 3, 1995. Accordingly, the court awards Appellant prejudgment interest dating from February 3, 1995 and directs the parties to submit proposed calculations to the court within fourteen days.

## CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court is reversed, and judgment is entered in favor of Appellant for the amount of the distributions made to the limited partners, plus interest.

ENTER:

Dated: June 6, 2000

REBECCA R. PALLMEYER
United States District Judge